# W. Criss Lott, Ph.D.
## Clinical and Forensic Psychologist
*drwclott@gmail.com*

665 Highway 51 North  
Ridgeland MS 39157

Tel: 601-707-5023  
Fax: 601-707-5068

December 27, 2014

Sterling Kidd  
Baker, Donelson, Bearman, Caldwell & Berkowitz, PC  
Meadowbrook Office Park  
4268 I-55 North  
Jackson, MS  39211


RE: Charles Brown, Marnie Brown,  
Courtney Wells, Austin Wells, B.B.,  
a minor, by and through his mother and father,  
and next friends, Charles Brown and Marnie Brown;  
and G.B., a minor, by and through his mother and  
father and next friends, Charles and Marnie Brown          Plaintiffs

v.                                              Civil Action No. 3:14cv197-DPJ-FKB

Ford Motor Company, XYZ  
Corporations 1 -10                                              Defendants


Dear Mr. Kidd:

Per your request, I am writing to provide a review of the report provided by Stan Smith, Ph.D., in the matter of Charles Brown et al. v. Ford Motor Company, et al. dated 11/19/14.

**Information Reviewed:**  I reviewed the following sources of information:

1. Deposition of Charles Brown, dated September 15, 2014
2. Deposition of Marnie Brown, dated September 15, 2014
3. Deposition of Austin Wells, dated September 16, 2014
4. Deposition of Courtney Wells, dated September 16, 2014
5. VIN FSA Details for 2001 Ford F-Series Truck

EXHIBIT "D"

6. Bancorp South records (which reveal financial problems with mortgage payments in 2010)
7. Wesley Medical records for Charles Brown (which document a history of headaches, hypertension, sleep disturbance and anxiety since 2008)
8. Hattiesburg Clinic Records for Charles Brown (noted that the couple had an "open marriage" and Mr. Brown tested positive for Chlamydia 1/21/14)
9. Wesley Medical Group records for Marnie Brown (which document a history of chronic back pain with parathesias in 2007, anxiety, depression and family stress in 2010)
10. Hattiesburg Clinic records for Marnie Brown
11. Forrest General Hospital records for Marnie Brown
12. Wesley Medical Group records for Austin Wells
13. Hattiesburg Clinic records for Austin Wells
14. Wesley Medical Group records for Courtney Wells (which document history of migraines since 1/2009)
15. Hattiesburg Clinic records for Courtney Wells
16. Children's Medical Group records for G▇ B▇
17. Hattiesburg Clinic records for G▇ B▇
18. Wesley Medical Group records for G▇ B▇
19. Children's Medical Group records for B▇ B▇
20. Hattiesburg Clinic Medical records for B▇ B▇ (no records)
21. Wesley Medical Group records for B▇ B▇
22. Report and records from Carl Dickerson, Ed.D., dated December 8, 2014
23. Report of Randall Thomas, dated November 20, 2014
24. Report of Stan Smith, dated November 19, 2014
25. Test materials for Charles Brown, Marnie Brown, Courtney Wells and Austin Wells, G▇ B▇ and B▇ B▇
26. Video Interviews by Dr. Smith of Charles Brown, Marnie Brown, Courtney Wells and Austin Wells on November 16, 2014 and again on December 5, 2014

I was provided with a three page report by Dr. Smith. In his report he rendered the following diagnostic opinions and treatment recommendations regarding the plaintiffs:

> **Examiner Opinions:**
>
> (1) Charles Brown (father, age 37) suffers from Trauma, Post-traumatic Stress Disorder, and Sexual Dysfunction Disorder.
> (2) Marnie Brown (mother, age 38) suffers from Trauma, Post-traumatic Stress Disorder, and Behavioral Neurol-Executive

Brain Function Dysfunction.
(3) Courtney Wells (daughter, age 18) suffers from Trauma and Post-traumatic Stress Disorder
(4) G▇ B▇ (son, age 8) suffers from Trauma, Post-traumatic Stress Disorder, and Behavioral Neurol-Executive Brain Function Dysfunction.
(5) B▇ B▇ (son, age 6) suffers from Trauma, Post-traumatic Stress Disorder, and Behavioral Neurol-Executive Brain Function Dysfunction.
(6) Austin Wells (son, age 22) suffers from Trauma, Generalized Anxiety Disorder and Depressive Disorder

**Treatment Recommendations:**

1) For those Brown Family members displaying Trauma, Post-traumatic Stress Disorder and Executive Brain Dysfunction they will require an inpatient therapeutic services involving Neurol-Cognitive Rehabilitation (projected to be 3 to 6 months). Additionally, upon their return outpatient treatment by a Medical Psychotherapist projected to be approximate three (3) years.

2) For those Brown Family members displaying Trauma and Post-traumatic Stress Disorder they will be required outpatient treatment by a Medical Psychotherapists to be approximate three (3) years.

3) For that Brown Family member displaying Trauma, Generalized Anxiety Disorder, and Depressive Disorder they will be required outpatient treatment by a Medical Psychotherapist projected to be approximately three (3) years.

---

I have multiple concerns regarding the nature and method of Dr. Smith's assessment and his treatment recommendations.

First, as indicated in his records, Dr. Smith was aware that this was a forensic evaluation. As such, there are several essential factors involved in conducting a forensic mental health assessment (FMHA). A forensic mental health

assessment should include an in-depth clinical interview, relevant testing, and collateral sources of information. As Heilbrun, Marczyk and DeMatteo (2002) noted, "it is virtually always necessary to obtain historical information regarding the individual being evaluated in a FMHA, and this historical information is often more extensive than what is needed in a therapeutic evaluation." The emphasis on an in-depth evaluation is also underscored in the report generated by the Behavior Rating Inventory of Executive Function – Adults (BRIEF-A) used by Dr. Smith, which states, "the clinical information gathered from an in-depth profile analysis of the BRIEF-A is best understood within the context of a full assessment that includes (a) a detailed history of the individual; (b) performance-based testing; (c) reports on the BRIEF-A from informants; and (d) observation of the individual's behavior. By examining converging evidence, the clinician can constantly arrive at a valid diagnosis and, most importantly, an effective treatment plan."

***From the information provided by Dr. Smith, there is no indication in his report or in his interviews that he obtained an in-depth history of any of the individuals in this case.***

Another critical component in conducting a FMHA is the use of multiple sources of information. According to Heilbrun,

> This is a very important principle in FMHA. Because of the circumstances under which FMHA is typically conducted, involving some incentive for the individual being evaluated to distort self-report and psychological testing data, it is important to use multiple sources (including collateral records and interviews) to assess the consistency of information across the sources. Agreement across sources makes it more likely that the agreed-upon information is accurate, while inconsistency across sources means that there is inaccuracy in at least one source of the information.

This principle is also articulated in the Specialty Guidelines for Forensic Psychology. As noted in 8.03 of the Guidelines, "Forensic practitioners strive to access information from collateral sources." In 9.02 the Guidelines state that, "Forensic practitioners ordinarily avoid relying solely on one source of data, and corroborate important data whenever feasible. ... When relying upon data that have not been corroborated, forensic practitioners seek to make known the uncorroborated status of the data, any associated strengths and limitations, and the reasons for line up on the data." As Melton, et al, (2007) noted, forensic examiners rely on third-party data for three reasons: "a greater need for accuracy, differences in response style between persons in therapeutic and forensic evaluation contexts,

and the greater scrutiny that the evaluators' conclusions receive." And as Melton noted, "given this goal, archival and third-party information is a mandatory component of most forensic evaluations." Additionally, Heilbrun, Marczyk and DeMatteo (2002) stated, "test results should be treated as hypotheses to be verified through other sources, including collateral records and third-party interviews. ... Such collateral approaches should be emphasized more strongly than present-state psychological testing and evaluations calling for reconstruction of an individual's thinking, feeling, and behavior at an earlier time." Furthermore, Heilbrun noted, "one of the more important aspects of a FMHA is the systematic assessment of response style of the individual being evaluated, particularly the deliberate over-reporting or under-reporting of relevant deficits or symptoms. This principle considers the use of records and collateral informants in establishing a history from multiple sources and in determining whether self-report information is consistent with other sources and more likely to be accurate." Dr. Smith's failure to examine prior medical records of the family, particularly the records of Mr. and Mrs. Brown is a serious oversight, as their medical records reveal a history of concerns with anxiety, depression and sleep disturbance for Mrs. Brown and a history of chronic pain, migraines, anxiety and sleep disturbance for Mr. Brown. Mr. Brown's medical records also revealed a history of sexual problems prior to the alleged trauma, as well as a more recent diagnosis of Chlamydia for Mr. Brown. Dr. Smith also failed to explore possible multiple causes for their marital and sexual problems. He also indicated that he was aware that they had an 'open marriage,' but he did not explore how this practice and the other sexual concerns had affected the couples' relationship.

***As Dr. Smith noted in his deposition, he relied on no third-party sources of information or any other collateral sources of information other than immediate family members. Failing to obtain and to review relevant collateral sources of information (including, but not limited to medical and mental health records of the family members) significantly limits his forensic conclusion/opinions.***

Dr. Smith stated that he used "standardized Psychological, Trauma, and Behavioral Neuroscience testing." Dr. Smith obtained statements from family members who are also plaintiffs in this matter as well as self-report measures and personality testing from the plaintiffs. Dr. Smith stated in his deposition that he is qualified "to do personal injury neurology testing," but he did not perform any performance-based measures assessing cognitive dysfunction. Such measures typically include an assessment of response bias, intellectual functioning, executive functioning, psychomotor functioning, memory functioning, and language skills. Furthermore, test results obtained in a forensic assessment should be compared to

premorbid levels of functioning by comparing them to historical records, such as school records or previous testing. When asked in his deposition if he conducted any performance-based testing, Dr. Smith commented that he had the examinee read parts of questionnaires to him to assess reading level. This in no way represents a performance-based assessment.

Dr. Smith also conducted no performance-based testing that addressed the possibility of an attention deficit disorder with either of the younger boys – both of whom he said suffered from a "Behavioral Neurol-Executive Brain Function Dysfunction," and he obtained no collateral sources of data on the boys other than data from the immediate family members. A comprehensive assessment typically include continuous performance testing, intellectual testing, executive functioning testing, and measures assessing learning and memory, as well as questionnaires completed by third-party sources. Without a thorough assessment of the boys, an attention deficit disorder cannot be ruled out.

***Dr. Smith's failure to administer any performance-based measures to anyone in the family, particularly the family members he diagnosed as having "Behavioral Neurol-Executive Brain Function Dysfunction," significantly limits the validity of his diagnostic impressions and his treatment recommendations.***

As many authors have noted, forensic evaluators must address discrepancies in the data collected in a FMHA, and strengths and limitations of their evaluation should be noted. Dr. Smith did not provide any explanation for discrepancies between the results of the personality testing and self-report measures he obtained, and the diagnoses and treatment recommendations he rendered. For example, according to the results of the personality testing of Marnie Brown, she "provided an unusual combination of responses that is associated with non-credible reporting of somatic and/or cognitive symptoms. This combination of responses may occur in individuals with substantial medical problems who report credible symptoms, but it could also reflect exaggeration. She also provided an unusual combination of responses that is associated with non-credible memory complaints. This combination of responses may occur in individuals with significant emotional dysfunction, but it could also reflect exaggeration." When asked about the possibility for exaggeration in his deposition, Dr. Smith noted that the "K-r" scale was within normal limits. The K-r scale assesses the degree to which an individual is underreporting psychological problems – which was not the case in this evaluation. He made no effort to explain Marnie Brown's endorsement of infrequent psychopathological responses – thus calling into question the credibility of her physical and emotional complaints throughout the evaluative process.

Page 6 of 9

Dr. Smith also failed to address other concerns generated by his test data. For example, on the Behavior Rating Inventory of Executive Function on G▊ B▊ provided by the mother, "the Inconsistency scale is elevated, suggesting that ratings on the scales may not be internally consistent and that validity may be compromised. A cautious approach to interpretation is warranted." What is disconcerting about Dr. Smith's report is his lack of acknowledgment of these facts in his report or in his deposition and how these facts should limit or temper his conclusions regarding diagnoses and treatment.

Dr. Smith failed to address the results of the test data that contradicted his diagnoses. For example, the results of the personality testing for Austin Wells were valid and revealed no significant sources of psychopathology. In fact, according to the personality testing, "there are no indications of somatic, cognitive, emotional, thought, or behavioral dysfunction in this protocol." Additionally, the results of the BRIEF–A revealed no significant psychopathology. In fact, the testing indicated that Mr. Wells "everyday executive function suggests no concerns. ... None of the individual BRIEF – A scales were elevated, suggesting that Mr. Wells views himself as having appropriate ability to self-regulate, including the ability to inhibit impulsive responses, adjust to changes in routine or task demands, modulate emotions, monitor social behavior, initiate problem-solving activity, sustain working memory, plan and organize problem-solving approaches, attend to task-oriented output, and organize environment and materials." Additionally, Mr. Wells's results on Clinical Assessment of Attention Deficit-Adult scale were all within normal range, suggesting no psychopathology.

Inconsistencies are also seen in the test results of Charles Brown and the diagnoses rendered by Dr. Smith. For example, the results of the personality testing revealed no significant psychopathology on any of the Substantive Scales. Additionally, the results of the BRIEF–A revealed that "Mr. Brown's everyday executive function suggests no current concerns. ... None of the individual BRIEF – A scales were elevated suggesting that Mr. Brown views himself as having appropriate ability to self-regulate, including the ability to inhibit impulsive responses, adjust to changes in routine or task demands, modulate emotions, monitor social behavior, initiate problem-solving or activity, sustain working memory, plan and organize problem-solving approaches, attend to task-oriented output, and organize environment and materials."

The results of the personality testing for Courtney Wells revealed no significant psychopathology on any of the Substantive Scales with the exception of the Head Pain Complaints (HPC) scale and the Anger Proneness (ANP) scale. In fact, her scores on the anxiety and stress/worry scales were within normal limits.

According to the results of the BRIEF–A for Courtney, "Ms. Wells everyday executive function suggests no current concerns. ... None of the individual BRIEF - A scales were elevated, suggesting that Ms. Wells views herself as having appropriate ability to self-regulate, including the ability to inhibit impulse responses, adjust to changes in routine or task demands, modulate emotions, monitor social behavior, initiate problem-solving or activity, sustain working memory, plan and organize problem-solving approaches, attentive task-oriented output, and organize environment and materials." According to the Posttraumatic Stress Diagnostic Scale, Courtney's symptom severity rating was described as mild and the results indicated that "the individual reported that she has experienced symptoms as a result of the traumatic event; however, she indicated that the symptoms have not interfered with her life the past month."

Moreover, as Heilbrun noted, "there should be a strong relationship between the procedures and findings documented in the report and the expert testimony that is provided based on this evaluation. Almost the entire substantive basis for expert testimony should be documented in the evaluation, allowing the presenting attorney to use the expert findings more clearly and effectively, the opposing attorney to prepare to challenge them, the judge to understand them, and the expert to indicate them." Dr. Smith failed to provide an in-depth report on any of the individuals in this case.

Another concern that I have with Dr. Smith's evaluation is the fact that he rendered an opinion based on data and interviews he obtained in November 2014, and then he later obtained additional data in December 2014 (after he had rendered his opinions and recommendations) by going through the diagnostic criteria of the post-traumatic stress disorder item by item, using the Diagnostic and Statistical Manual of Mental Disorders, fifth edition (DSM-V) with all of the plaintiffs he interviewed, thereby influencing and contaminating his findings regarding the diagnosis of posttraumatic stress disorder. I found this procedure to be inappropriate and to essentially contaminate any future evaluations regarding the diagnosis of post-traumatic stress disorder in all of these individuals.

Dr. Smith also opined that several of the plaintiffs suffered from a "Behavioral Neurol-Executive Brain Function Dysfunction." This is not a diagnosis or disorder found in the DSM-V (or in any previous manuals of the DSM) and he fails to explain what is meant by these terms in his report.

***Dr. Smith's failure to provide the substantive basis for the forensic opinions in his report and his failure to address inconsistencies between his test data and his forensic opinions significantly compromises the reliability of his***

*forensic conclusions.*

In sum, the deficiencies in the nature and methodology of Dr. Smith's evaluation in this case are multiple and, in my opinion, significantly limit the validity of his forensic conclusions and recommendations.

Please advise if I can provide any additional information.

Respectfully,

W. Criss Lott