UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

CHARLES BROWN, et al.                                                                             PLAINTIFFS

v.                                                                     CIVIL ACTION NO. 3:14cv197-DPJ-FKB

FORD MOTOR COMPANY                                                                          DEFENDANT

ORDER

This products-liability case is before the Court on the following motions filed by Defendant Ford Motor Company: Motion to Exclude the Opinions of Mark Sutherland [85]; Motion to Exclude the Opinions of Stan Smith [86]; Motion for Summary Judgment [89]; and Motion for Summary Judgment on Plaintiffs' Punitive Damages Claim [91]. As set forth below, the Motion to Exclude the Opinions of Mark Sutherland [85] is granted in part, and the Motion for Summary Judgment [89] is granted. The remaining motions [86, 91] are denied as moot.

I.      Facts and Procedural History

This case arises from a May 10, 2011 fire at Plaintiffs' home allegedly caused by a design defect in the speed-control deactivation switch ("SCDS") in their 2001 Ford F-150 truck. In layman's terms, the SCDS operates to cut off an engaged cruise-control system when the driver applies the brakes. At the time of the fire, which occurred in the middle of the night, the truck was off, unattended, and parked in the carport.

Plaintiffs Charles Brown, Marnie Brown, Courtney Wells, Austin Wells, and minors B.B. and G.B. filed this suit against Ford Motor Company on March 10, 2014. Compl. [1]. They seek compensation for the loss of their home, its contents, and the truck, as well as damages for psychological injuries. Following the close of discovery, Ford filed its dispositive and *Daubert* motions. The Court held a hearing on the matter on May 8, 2015, after which it gave the parties

an opportunity to explore settlement. Those negotiations failed, and the Court is now prepared to rule. Personal and subject-matter jurisdiction exist.

II.     Standard

    A.     Expert Testimony

The following oft-stated rules apply to the Court's gate-keeping role. To begin, "whether a proposed expert should be permitted to testify is case, and fact, specific." *Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 194 (5th Cir. 2006). Moreover, the district court retains "'broad latitude' both in deciding how to determine whether an expert's testimony is reliable, and ultimately, whether the testimony is, in fact, reliable." *Id*. (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142 (1999)). When evaluating expert testimony, the overarching concern is whether or not it is relevant and reliable. "A party seeking to introduce expert testimony must show '(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.'" *Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007) (quoting Fed. R. Evid. 702). A court should "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152.

The gatekeeper function of the district court does not, however, replace trial on the merits. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596 (1993). In

performing its gatekeeper function prescribed under *Daubert*, the district court should approach its task with proper deference to the jury's role as the arbiter of disputes between conflicting opinions. Finally, "[t]he party offering the expert must prove by a preponderance of the evidence that the proffered testimony satisfies the rule 702 test." *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60 (5th Cir. 2002).

      B.      Summary Judgment

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil Procedure when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law. The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. In reviewing the evidence, factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). When such contradictory facts exist, the court may "not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*,

530 U.S. 133, 150 (2000).

III.     Analysis

Plaintiffs assert a design-defect claim under the Mississippi Products Liability Act ("MPLA"), Mississippi Code section 11-1-63.[1]  To recover on such a claim,

> the plaintiffs must prove that at the time the product left the control of the manufacturer or seller:  (1) the product was designed in a defective manner; (2) the defective condition rendered the product unreasonably dangerous to the user or consumer; and (3) the defective and unreasonably dangerous condition of the product was the proximate cause of the plaintiff's damages.

*3M Co. v. Johnson*, 895 So. 2d 151, 161 (Miss. 2005).  To establish that the product was unreasonably dangerous, Plaintiffs

> must show by a preponderance of evidence that at the time the product left the control of the manufacturer:  (i) The manufacturer or seller knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have known, about the danger that caused the damage for which recovery is sought; and (ii) The product failed to function as expected *and* there existed a feasible design alternative that would have to a reasonable probability prevented the harm.

*Id.* at 165 (emphasis added); *see also A.K.W. ex rel. Stewart v. Easton-Bell Sports, Inc.*, 454 F. App'x 244, 247 (5th Cir. 2011) (per curiam).

This case turns largely on the existence, *vel non*, of a feasible design alternative.  "A feasible design alternative is a design that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users

---

[1]The Complaint included several additional claims as to which Ford moved for summary judgment and that Plaintiffs failed to address in their response.  Summary judgment is therefore granted as to the following abandoned claims:  a failure-to-warn claim, claims for damages to the vehicle, claims related to the quality of replacement housing or medical costs, common-law claims, and Austin Wells's claims.  *See Black v. N. Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) ("[Plaintiff's] failure to pursue this claim beyond [the] complaint constituted abandonment.").

or consumers." *Id.* A feasible design alternative is an essential element of a design-defect claim. Miss. Code Ann. § 11-1-63(f)(ii); *see also Davis v. Ford Motor Co.*, 375 F. Supp. 2d 518, 523 n.8 (S.D. Miss. 2005) (noting that "a party alleging a defective design in a products liability action must provide a 'feasible design alternative'").

Many cases from this Court have held that expert testimony is generally required to prove a claim under the MPLA. *See, e.g.*, *Harris v. Spine*, 39 F. Supp. 3d 846, 850 (S.D. Miss. 2014). But as the Fifth Circuit noted in *Guy v. Crown Equipment Corporation*, "the MPLA's plain language does *not* state expert testimony is required *per se* to prove a design defect." 394 F.3d 320, 331 (5th Cir. 2004). The *Guy* Court did not answer the question, however, because the plaintiff offered expert testimony. *Id.* The same is true here.

The Court concludes that expert testimony is necessary given the specific facts of this case, because the issues fall beyond the grasp of a lay jury. *See Ala. Great S. R.R. Co. v. Jobes*, 156 So. 3d 871, 883 (Miss. 2015) (reversing denial of summary judgment where plaintiff offered no expert testimony on issues "beyond the capabilities of the average lay person"); *Latham v. Hayes*, 495 So. 2d 453, 460 (Miss. 1986) (en banc) (noting need for expert testimony to address "factors beyond the common knowledge of a lay jury").

Here, Plaintiffs have designated as an expert Mark Sutherland, an engineer and certified fire and explosion investigator. Sutherland's initial opinions related solely to proximate cause, but he later opined that the Plaintiffs' F-150 was defectively designed and that two feasible alternatives existed at the time the vehicle left Ford's hands. Though probably out of order, the Court will start with proximate cause, because the analysis is brief.

A.     Proximate Cause

Sutherland opined in his January 28, 2014 report "that the SCDS failed internally and was the probable cause for the fire." Pls.' Designation of Experts [87-1] Ex. B at 4. Ford does not contest Sutherland's qualification to render this opinion, instead arguing that the opinion is not "the product of reliable principles and methods," Fed. R. Evid. 702(c). Having heard from Sutherland in the evidentiary hearing in this matter, the Court concludes that the methodology underpinning Sutherland's causation opinion is sufficiently reliable to be admissible under Rule 702. Contrary to Ford's arguments, Sutherland explained how he ruled out other causes of the fire, and while there may have been omissions in his methodology, they go to weight rather than admissibility. The motion to exclude is denied as to the causation opinion.

B.     Design Defects and Design Alternatives

Sutherland's defect opinions were not disclosed until the eve of his deposition. *See* Pls.' 1st Supplemental Designation of Experts [87-4]. Even then, Plaintiffs merely disclosed the following:

> It is expected that Mr. Sutherland will offer opinions that the subject Speed Control Deactivation Switch was defective, thereby rendering the Browns' 2001 Ford F-150 defective, and that the vehicle did not perform as expected as a result of the defective switch. He is expected to offer opinions that at least two feasible alternative designs were available to Ford prior to the manufacture of the vehicle at issue . . . .

*Id.* at 2. As to these opinions, Ford argues both that Sutherland is not qualified and that his methodology is unreliable.

Starting with qualifications, Ford asserts that Sutherland "has absolutely no pertinent experience in the areas of automotive design, manufacture or repair." Def.'s Mem. [87] at 18.

While all of that is true, Sutherland is an electrical engineer who has familiarity with the way the SCDS functions.  "A witness . . . can qualify as an expert even though he lacks practical experience, provided that he has received suitable training or education or has otherwise gained the requisite knowledge or skill."  *Lavespere v. Niagra Mach. & Tool Works, Inc.*, 910 F.2d 167, 176–77 (5th Cir. 1990), *abrogated on other grounds by Little*, 37 F.3d 1069; *see Miss. Phosphates Corp. v. Analytic Stress Relieving, Inc.*, 402 F. App'x 866, 872 (5th Cir. 2010) (per curiam); *Imperial Trading Co., Inc. v. Travelers Prop. Cas. Co. of Am.*, No. 06-4262, 2009 WL 2356292, at *4 (E.D. La. July 28, 2009).  Sutherland is qualified to render the defect and design opinions; the question is whether his opinions are sufficiently reliable.

       1.    Defect Opinion

As to the substance of his defect opinion, Sutherland testified about it at some length in the May 8, 2015 hearing.

> Q.  All right.  What was the design defect?
>
> A.  Well, the switch itself was never designed for negative pressure.  It was only designed—the design specs only stated positive pressure.  And so, but in the actual use of the switch, it actually encountered negative pressure.  When somebody was applying the brakes and then they would release the brakes rapidly, there will be a vacuum induced on the system. . . .
>     And so what would happen is that there is a seal.  The switch itself has got two pieces, a mechanical piece, which is called the Hexport, and then an electrical piece which we are calling the switch.  And those two are separated by a capped on seal. . . .
> . . . .
>     [W]hat happened then is when you applied negative pressure to the capped on seal, it would actually start developing a crack, and that crack then let brake fluid and contaminants into the switch area.  That switch is powered at all times, so it started developing conductive paths to ground, because the Hexport is actually screwed into the body of the brake master cylinder, and it is grounded, so you then have a path to ground and then you start conducting electricity between the hot contact and ground.  And that—as that develops, the conductive path

increases. It actually creates heat because you're dissipating heat inside there, and it starts to melt the plastic housing, and it will eventually ignite it.

Q. Ignite what?

A. The plastic housing.

Q. Okay. And what does that lead to?

A. That leads to a fire.

Tr. [131] at 13–17.

Ford challenges Sutherland's methodology based on the fact that he relied, in large part, upon documents produced in a wholly separate lawsuit, *Zuno v. Ford*. *See* Sutherland Dep. [87-3] at 20, 38. Sutherland last saw those documents in 2010, after which he returned them to Ford pursuant to a protective order. He did, however, retain a spreadsheet that included descriptions of the documents. Tr. [131] at 74–75. Sutherland prepared the summary in combination with the *Zuno* plaintiffs' attorney and could not differentiate who wrote what. *See id.* at 75–76; *see also* Sutherland Dep. [87-3] at 33. The actual *Zuno* documents were never requested during discovery in this civil action and are not in Sutherland's possession or in this record.

The *Zuno* documents raise a serious issue, but as to the defect opinion, other documentation exists. In particular, Sutherland relies on a 2006 report from the National Highway Traffic Safety Administration's Office of Defects Investigation regarding a 2005 recall of the subject component in the F-150. *See id.* at 38; Tr. [131] at 27. So to the extent Sutherland's defect opinion relies on this report, Ford's arguments regarding the *Zuno* documents do not apply. Sutherland's defect opinion is sufficiently reliable to be admitted. Thus Plaintiffs

have admissible expert testimony on the first (design defect) and third (proximate cause) elements of their design-defect claim.

### 2. Design Alternatives

As stated, Plaintiffs' supplemental expert designation generically states that two feasible design alternatives exist. In his deposition, taken the following day, Sutherland identified the two alternatives: (1) a fuse similar—but not identical—to the fuse Ford currently employs following the 2005 recall and (2) a relay. *See* Tr. [131] at 53; Sutherland Dep. [87-3] at 21–22. Ford challenges both.

#### a. Fuse Alternative

During his deposition, Sutherland suggested that the addition of a half-amp fuse in the switch would have prevented the fire. Sutherland Dep. [87-3] at 141. But by the time he arrived at the *Daubert* hearing, Sutherland had concluded that his half-amp fuse would disable the cruise-control system entirely. Tr. [131] at 64–65. He therefore changed his opinion from the witness stand and proposed a 1-amp fuse alternative. *Id.* at 62. Sutherland had never "taken a 1-amp fuse and installed it in . . . a 2001 Ford F-150 like the Browns' vehicle to see how it works" and was not aware of "any testing that's been done using the 1-amp fuse." *Id.* at 66–67.

Sutherland's evolving opinions regarding the fuse leaves the Court with nothing more than insufficient "conceptual[ized] possibilities." *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 992 (5th Cir. 1997); *see also Guy*, 394 F.3d at 327 (affirming rejection of expert testimony where expert continued to change design alternative and had "not closely studied th[e final] design"). In short, Sutherland has not employed "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152.

There is, however, one potential fuse alternative worth mentioning—the one Ford now puts in its trucks. Ford employs a 2-amp fuse in vehicles impacted by the 2005 recall. Tr. [131] at 62. Ford presumably believes this design alternative is feasible. The only problem is that Sutherland disagrees. According to him, Ford's 2-amp fuse is "an improper repair and it won't prevent fires." *Id.* at 66. Indeed Sutherland opined in another Ford case that the new switch caused another fire. Sutherland Dep. [87-3] at 134.

During the *Daubert* hearing, the Court gave Plaintiffs an opportunity to back away from Sutherland and claim the new design as its feasible alternative. *See, e.g.*, Tr. [131] at 107, 111. They did not. Instead, counsel stated, "I will just take the relay [alternative]," then adding that he still thought Sutherland's testimony regarding *his* switch presented a feasible alternative. *Id.* at 116. The Court is certainly troubled by the idea that this claim fails for lack of an design alternative when Ford now employs one. But Plaintiffs have disavowed Ford's design and instead rely on Sutherland's modification of Ford's new switch along with the proposed relay. They may well have solid reasons for that decision, and the Court will not second guess them. But the 1-amp fuse alternative is not supported.

      b.    Relay Alternative

The problems with Sutherland's relay alternative begin with the *Zuno* documents and Sutherland's conflicting testimony as to whether he relied upon them. Ford has aggressively challenged Sutherland's reliance on the *Zuno* documents. So during Sutherland's direct examination at the *Daubert* hearing, the Browns' attorney asked him, "Did you rely on the *Zuno* documents in forming your opinions in this case?" *Id.* at 36. Sutherland responded with a flat "[n]o." *Id.* But he gave an entirely different response during cross examination, agreeing that he

relied on the *Zuno* documents "for [his] opinions in the Brown case." *Id.* at 73.

This reliance was evident during the hearing. For example, Sutherland frequently stated that he had seen written communications between Ford and its supplier, Texas Instruments, in which Texas Instruments recommended a relay it had tested. *See, e.g.*, *id.* at 35, 98. Plaintiffs' counsel likewise relied on the Texas Instrument communications during argument. *Id.* at 113. Those documents were from the *Zuno* case. *Id.* at 98; *see also* Sutherland Dep. [87-3] at 136–39. The Court finds that Sutherland relied on the *Zuno* documents for his opinions regarding the relay.

Had the *Zuno* documents been in Sutherland's possession when he presented his relay opinions, then perhaps he could have appropriately relied upon them. But as it stands, those documents were not requested in this case, and Sutherland has not seen them since 2010. Tr. [131] at 74–75. Even assuming the accuracy of his summary and recollection of the documents—which seemed suspect and is disputed—Sutherland offered general observations from those documents rather than supporting data.

Of more fundamental concern, there is simply no way to know whether the testimony is based upon sufficient facts or whether they have been reasonably applied. *See Smith*, 495 F.3d at 227. In essence, Sutherland has asked the Court to take his word for it that the documents say what he recalls them saying and that they actually support his opinions. While an expert may certainly rely on existing data, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) (quoted in *Kumho Tire Co.*, 526 U.S. at 157). Without knowing what the *Zuno* documents actually say,

there is no way to tell whether Sutherland has surpassed that minimal showing. The Court therefore concludes that any reliance on the *Zuno* documents would not be sufficiently reliable under Rule 702.[2]

Sutherland does, however, point to one document that was originally included in the *Zuno* documents but is now in his possession. During his deposition, Sutherland mentioned that he had previously seen "the Ford 14D" related to a 1999 recall but that he returned the document. Sutherland Dep. [87-3] at 136–37. At some point prior to the *Daubert* hearing, Sutherland located a redacted version of that document on the internet. Tr. [131] at 98–99. He did not bring it to the *Daubert* hearing or otherwise produce it. *Id.* at 53–55.

The Court has never seen this document and does not know what it contains. Nevertheless, Sutherland agreed during the hearing that it relates to a recall of certain Ford vehicles in 1999 that did not include any Ford trucks. *Id.* at 56. Sutherland also testified that the 14D related to a different switch. *Id.* at 94. He claims, however, that the 1999-recall switch and the subject switch were "substantially the same," though they were mounted in different locations on the engine and operated under different pressures. *Id.* Significantly, Ford claims the 1999 recall and related 14D involved a manufacturing—rather than design—defect. *Id.* at 96–97. Sutherland acknowledged that Ford thought the recall related to a manufacturing defect. *Id.* at 97–98. But he stated that Ford was mistaken based on the information it received from Texas Instruments—information reflected in the *Zuno* documents. *Id.* at 98.[3]

---

[2]The 1-amp fuse alternative suffers from this same problem.

[3]Sutherland's testimony during this stage of the hearing begs the question whether Ford was aware of a design defect in 2001—four years before the 2005 recall that included the F-150. *See* Miss. Code Ann. § 11-1-63(f)(i). According to Sutherland, Ford "didn't find out until the

As frustrating as this may seem, the Court simply cannot say that Sutherland reasonably relied on the redacted 14D. While it would be tempting for the Court to search the internet for the document and determine who is right and whether it supports Sutherland's opinions, Plaintiffs bear the burden of establishing reliability by a preponderance of the evidence. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc). The Court feels restrained to apply that test based on the actual record evidence and concludes that Plaintiffs have not met their burden.

The details of the relay solution are likewise problematic. Sutherland admits he has never built, installed, or tested the relay in a Ford F-150. Tr. [131] at 57; *see also id.* at 59 (testifying based on 14D that "Ford tested that"). When asked whether he has any "documents, papers, diagrams, [or] something . . . [to] show the court that demonstrates how this relay works, what it looks like, how it operates, how it performs," Sutherland stated, "Yes . . . [i]t's in my file." *Id.* at 55. But he did not have his file with him and has never produced a design.

The Court pursued this issue during argument, asking Plaintiffs' counsel where the actual design could be found in the record. He responded, "I think it's in 14D." *Id.* at 115. But counsel quickly deferred to Sutherland (who was still in the courtroom), and Sutherland merely said, "They tested it with the relay." *Id.* at 116. Sutherland failed to say what he based that statement on or where the Court could find an actual design. In sum, no such diagrams or documents have ever been provided, and at best, Sutherland merely testified as to how he would envision a relay working. *Id.* at 102–03. This is not sufficient. *See Guy*, 394 F.3d at 327.

The Court certainly recognizes that experts are not required to "physically build a model"

---

testing done in 2005 what the real problem was." *See* Tr. [131] at 99–100.

of an design alternative. *Hyundai Motor Am. v. Applewhite*, 53 So. 3d 749, 756 (Miss. 2011) (rejecting argument that plaintiff's computer simulation was insufficient). But an expert must offer something demonstrating that he or she exercised "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. Plaintiffs have not met their burden on this point.

Finally, as to both alternatives, Sutherland testified that "when [he] said these designs were feasible, [he] meant that they were economically feasible." Tr. [131] at 62. Plaintiffs have not established that either would not impair the utility or usefulness of the vehicle, its cruise-control system, or the SCDS. *Cf. 3M Co.*, 895 So. 2d at 165.

The Court concludes that Sutherland's methodology in reaching these opinions fails *Daubert*'s reliability test. And because Plaintiffs have not established the existence of a feasible design alternative, their design-defect claim fails. The Motion to Exclude the Opinions of Mark Sutherland [85] is granted in part, and the Motion for Summary Judgment [89] is granted.

IV.     Conclusion

The Court has considered all of the parties' arguments. Those not specifically addressed would not have changed the outcome. For the foregoing reasons, the Motion to Exclude the Opinions of Mark Sutherland [85] is granted in part, the Motion for Summary Judgment [89] is granted, and Plaintiffs' claims are dismissed with prejudice. The remaining motions [86, 91] are denied as moot. A separate judgment will be entered pursuant to Rule 58 of the Federal Rules of Civil Procedure.

**SO ORDERED AND ADJUDGED** this the 7th day of August, 2015.

s/ *Daniel P. Jordan III*
UNITED STATES DISTRICT JUDGE